IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2018

**STATE OF TENNESSEE v. AMAIL JOHN LAND**

**Appeal from the Criminal Court for Dekalb County**
**No. 2015-CR-254    David A. Patterson, Judge**

_____

**No. M2017-00422-CCA-R3-CD**
_____

The defendant, Amail John Land, appeals his Dekalb County Criminal Court jury convictions of burglary, theft of property valued at less than $500, and vandalism of property valued at less than $500. He challenges the admission of his pretrial statement to the police, the admission of testimony concerning the contents of a video recording that had been destroyed prior to trial, and the sufficiency of the convicting evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Craig P. Fickling, District Public Defender; and Allison West, Assistant District Public Defender, for the appellant, Amail John Land.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Stephanie Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Dekalb County Grand Jury charged the defendant with one count of burglary, one count of theft of property valued at less than $500, and one count of vandalism of property valued at less than $500.

At the defendant's September 2016 trial, James Elliot Bradshaw, the owner of Center Hill Wine and Spirits ("the store"), testified that the store opened for business during the second week of September 2015. Just before 5:00 a.m. on September 25, 2015, Mr. Bradshaw received a telephone call from his "monitoring service that we had a

glass breakage at the store." He arrived at the store approximately 15 minutes later to find two city police cars parked in front of the store; the "front door was shattered, completely broken out." Upon stepping inside the store, Mr. Bradshaw observed "a large rock or stone, eight to [10] inches in diameter, that was about [25] feet inside the building, inside the store." He noticed that "two .175, approximately half a gallon" containers of vodka were missing from just inside "the entrance to the right of the front door." Mr. Bradshaw said that the value of the bottles was less than $75 and that the value of the broken door was $285.

After the police officers determined that no one was inside the store, Mr. Bradshaw took the officers into his office, where they reviewed the footage from the video surveillance cameras that Mr. Bradshaw had installed at the store. Mr. Bradshaw agreed that he had difficulty operating the playback software because it was the first time he had done so. Later that same day, at approximately 3:00 p.m., the defendant came into the store to make a purchase, and Mr. Bradshaw told the police, who were present in the store due to an unrelated "altercation," that he recognized the defendant as the person seen on the video surveillance breaking into the store. He said that he identified the defendant by "his posture" and by the presence of "a pumpknot right on the top of his head." Mr. Bradshaw stated that he confronted the defendant, and the defendant denied that he had broken into the store. Mr. Bradshaw said that he asked the defendant to remove his coat and baseball cap and that, when the defendant complied, he was positive that the defendant was the same individual he had observed on the video surveillance footage. Mr. Bradshaw positively identified the defendant in court as the man who he had seen on the surveillance video breaking into the store.

Mr. Bradshaw testified that the police viewed the video surveillance footage and that "they had taken a snapshot of the gentleman standing at the door" but that neither he nor the officers made any attempt to make a copy of the footage. He said that he "did not understand at that time that [the footage] would be erased after eight days." He said that he "would have saved" the footage had he known that it would be erased automatically.

Smithville Police Department Detective Brandon Donnell testified that he participated in the investigation of the break-in at the store. He said that he interviewed Mr. Bradshaw and viewed the video surveillance footage. Detective Donnell identified the defendant as the individual depicted on the footage breaking into the store. Detective Donnell said that, because Mr. Bradshaw was unfamiliar with the software, he was unable to provide the detective with a copy of the surveillance footage. For this reason, Detective Donnell took still photographs of the footage using the camera on his cellular telephone. He said that he wanted the photographs "just in case something like this did

happen to where . . . the video was messed up." The photographs taken by Detective Donnell were admitted into evidence and displayed to the jury.

Detective Donnell testified that, after he identified the defendant as a suspect, he "went out looking for him" but that he "did not find [the defendant] until he showed back up at the store later that day." Detective Donnell recalled that other officers had gone to the store in the afternoon on an unrelated matter and that he went to the store after he was contacted by another officer. When Detective Donnell arrived at the store, the defendant was seated on the curb. He stated that he told the defendant that they "needed to go to the police department and talk," and the defendant agreed to go. Detective Donnell testified that, at the outset of the interrogation, he provided *Miranda* warnings to the defendant. During the ensuing interview, which lasted between 25 and 30 minutes, the defendant "denied everything."

At that point, Detective Donnell took the defendant to "where the officer's office is, where we do our paperwork." When they arrived in the office area, Lieutenant Matt Holmes asked if he could speak with the defendant. Detective Donnell, Lieutenant Holmes, and the defendant went into the "officer's office." Detective Donnell described what happened next: "Lieutenant Holmes asked him, said you're about to get charged with this, I don't believe that you went in to take much, just, and about that time [the defendant] says no, I just stuck my arm in there to get two bottles of vodka." Detective Donnell said that although the interrogation of the defendant that he conducted in the interview room was recorded, the one conducted in the "officer's office" was not. Additionally, Detective Donnell testified that he did not preserve the recording of the initial interrogation because the defendant had not made any admissions during that time.

During cross-examination, Detective Donnell conceded that the notes he took during Lieutenant Holmes's questioning of the defendant indicated that the defendant "told Lieutenant Holmes that he took a rock and smashed the door of the liquor store, but did not take anything." He insisted, however, that he must have "written it down wrong." On redirect examination, he classified his notes as more of "a summary of everything going on at that time" than a verbatim recitation of the facts.

Detective Matt Holmes testified that he had viewed the video surveillance footage from the store and that he knew that Detective Donnell was interviewing the defendant. At some point, he "caught Detective Donnell in the hallway" and asked how the interview had gone. After Detective Donnell told him that the defendant had denied everything, Lieutenant Holmes confirmed that Detective Donnell had provided the defendant with *Miranda* warnings and then asked to speak with the defendant. He then went into the booking area where the defendant was seated, "sat down beside him[,] and struck up a conversation with him." Lieutenant Holmes described the booking area as "a

very small room where there's two computers and two desks and a few chairs where the officers do their reports and type this stuff." He said that he told the defendant that Detective Donnell was going "to do a warrant for burglary" and that he believed that the defendant had only "reached through" the window to take the liquor. At that point, the defendant "said, yes, that's what I did, I did, I just broke the window and I reached in and got it."

Following a full *Momon* colloquy, the defendant elected not to testify and chose to present no proof. Based upon the evidence presented, the jury convicted the defendant as charged of burglary, theft, and vandalism.

At the sentencing hearing, the State presented certified copies of judgments showing the defendant to have nine prior felony convictions, two of which counted as a single conviction. Based upon this evidence, the trial court determined beyond a reasonable doubt that the defendant was a career offender and imposed the statutorily-mandated 12-year sentence to be served at 60 percent release eligibility for the defendant's burglary conviction. The court noted that the defendant was not eligible for probation because the sentence exceeded 10 years and ordered the defendant to serve the entire sentence in confinement.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the denial of his motion to suppress, the admission of testimony concerning the contents of the video surveillance recording, and the sufficiency of the convicting evidence. We consider each claim in turn.

*I. Motion to Suppress*

Prior to trial, the defendant moved to suppress the statement he provided to Lieutenant Holmes on grounds that the State could not establish that he executed a valid waiver of his constitutional rights. At the hearing on the defendant's motion, Detective Donnell and Lieutenant Holmes testified largely as they did at trial.

Detective Donnell testified that he knew the defendant and that he was familiar with the defendant's "stature, everything, his movements." He said that, upon viewing the video surveillance footage from the store, he "knew this was [the defendant] on the video." When the defendant returned to the store in the afternoon, Mr. Bradshaw agreed that "he could tell that that was [the defendant] on the video." The defendant was arrested at the store and transported to the police station. Detective Donnell testified that he provided *Miranda* warnings to the defendant and that the defendant initially denied any involvement in the break-in. He said that the defendant did not appear to be under

the influence of an intoxicant and that the defendant did not, at any time, give any indication that he did not understand what was going on. After approximately 25 minutes passed without the defendant's making any admissions, Detective Donnell "brought [the defendant] back downstairs to the . . . holding area."

As the defendant sat in the booking area, Lieutenant Holmes approached the defendant and "asked him, . . . we have you on camera and why won't you just go ahead and admit to what you done." According to Detective Donnell, the defendant "said okay, I just stuck my hand in through the door and grabbed a bottle out after I broke the glass."

During cross-examination, Detective Donnell stated that the defendant signed the written rights waiver form but that "since [the defendant] denied everything and it wasn't going anywhere," he did not keep the form. He said that it was similarly not his practice to preserve a video recording of an interview if the defendant did not make a statement. As he did at trial, Detective Donnell acknowledged that his handwritten notes from the interview indicated that the defendant said that he smashed the door but did not take anything from the store.

Lieutenant Holmes confirmed that he encountered Detective Donnell and the defendant "as they were coming down from the interview." He said that Detective Donnell told him that he had administered *Miranda* warnings and that the defendant had denied any involvement. In keeping with his trial testimony, Lieutenant Holmes said that he told the defendant that he did not believe the defendant had gone into the store, and the defendant "immediately said yes, said I just broke it and reached in."

During cross-examination, Lieutenant Holmes acknowledged that he did not provide *Miranda* warnings to the defendant and that he had not seen Detective Donnell do so. He also conceded that he did not see a written waiver of rights form signed by the defendant.

At the conclusion of the hearing, the trial court concluded that there was "an uncontroverted understanding that the defendant was" provided with *Miranda* warnings prior to speaking with Detective Donnell and that "there's no reason for his rights to be read again to him" before speaking to Lieutenant Holmes. The court observed that although a recording of the defendant's incriminatory statement would have been helpful to its analysis, the absence of the recording did not justify suppressing the statement in this case.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215,

217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).  Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them.  *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d).  The application of the law to the facts, however, is reviewed de novo on appeal.  *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment).  This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted).  The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991).  To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined–a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth."  *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."  Tenn. Const. art. I, § 9.  "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment."  *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005).  "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'"  *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).  Moreover, because of the extra protection afforded by the state constitution, "[f]or the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the

consequences of abandoning his rights." *Thacker*, 164 S.W.3d at 249 (citing *Stephenson*, 878 S.W.2d at 544–45). Accordingly, "the totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived.'" *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting *Stephenson*, 878 S.W.2d at 545; *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

An accused "may knowingly and intelligently waive the right against self-incrimination only after being apprised of" the constitutional rights to remain silent and to counsel during interrogation. *Thacker*, 164 S.W.3d at 248. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545). "Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights are explained." *Blackstock*, 19 S.W.3d at 208.

Importantly, in this case, the defendant does not claim that the officers failed to provide him with *Miranda* warnings prior to questioning him, only that the State failed to submit a written waiver of rights form and that the testimony of Detective Donnell was insufficient to establish that the detective provided him with *Miranda* warnings and that he, in turn, voluntarily waived his constitutional rights. We disagree. Although it is certainly the better practice for officers to retain any video or audio recording of both the provision of *Miranda* warnings and the accused's waiver of the same, as well as any written waiver that is executed, neither a recording nor a written waiver is necessary to a determination that the defendant voluntarily waived his constitutional rights after having been duly informed of them. In this instance, Detective Donnell testified that he provided *Miranda* warnings to the defendant, who had an extensive criminal history that made him very familiar with law enforcement, and that the defendant voluntarily waived those rights. The trial court specifically accredited Detective Donnell's testimony. Within an hour of having waived his rights, the defendant was questioned a second time by Lieutenant Holmes. We agree with the trial court that a second *Miranda* warning was not required at that point. *See State v. Rogers*, 188 S.W.3d 593, 606 (Tenn. 2006) ("A valid waiver of *Miranda* rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights."). In sum, the accredited evidence presented by the State supports the conclusion that the defendant voluntarily waived his constitutional rights,

and, in consequence, the trial court did not err by denying the defendant's motion to suppress.

## II. Video Surveillance

Prior to trial, the defendant, citing *State v. Ferguson*, moved to dismiss the charges based upon the destruction of the video surveillance recording from the store. He argued that a trial in the absence of the video recording would be fundamentally unfair. The trial court denied the motion.

Following the presentation of the State's proof, the defendant renewed his motion to dismiss. He also argued, in the alternative, for an instruction regarding lost or destroyed evidence. The State argued that *Ferguson* did not apply in this case because the State had no duty to preserve the video recording because its contents were not exculpatory and because the video was "inadvertently deleted" rather than purposefully destroyed.

The trial court found that the video recording had been destroyed by Mr. Bradshaw's negligence rather than "some dishonest intent" on the part of a "state actor." The court noted that Detective Donnell had taken still photographs of the video surveillance recording, that he had identified the defendant using those photographs, and that the photographs had been admitted into evidence and viewed by the jury. The court denied the defendant's motion to dismiss but agreed to give a lost or destroyed evidence instruction, particularly in light of the fact that Detective Donnell did not preserve the video recording of the defendant's initial interview, during which the defendant had denied committing the charged offenses.

In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)). Our supreme court has observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, *Merriman*, 410 S.W.3d at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785. The supreme court also "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate

the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

"(1) [t]he degree of negligence involved;
(2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
(3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

In this case, the surveillance recording from the store was inadvertently recorded over due primarily to Mr. Bradshaw's unfamiliarity with the software used to record and playback the video. Both Mr. Bradshaw and Detective Donnell testified that

-9-

Mr. Bradshaw had difficulty getting the video recording to play and that he was unable, on the day of the offense, to obtain a copy of the recording in a form that could be submitted to the police. Mr. Bradshaw testified that he did not know that the system would record over the video. Detective Donnell took still photographs of the video recording using the camera on his cellular telephone in an effort to preserve images of the offender, and those still photographs were submitted to the jury.

Assuming solely for the sake of argument that the State had a duty to preserve the surveillance recording, the record establishes that the loss of the recording was the result of simple negligence, that the recording was not very significant in light of the still photographs and testimony of Mr. Bradshaw and Detective Donnell, and that the other evidence presented at trial was more than sufficient to support the defendant's convictions. The defendant thoroughly cross-examined both Mr. Bradshaw and Detective Donnell about the loss of the recording, and, at the defendant's request, the trial court provided a jury instruction on the appropriate treatment of lost or destroyed evidence. Under these circumstances, the record supports the denial of the defendant's motion to dismiss.

In a related claim, the defendant asserts that the trial court erred by permitting Detective Donnell and Mr. Bradshaw to testify about what they had seen on the video recording, arguing that their testimony was inadmissible hearsay. The State contends that the trial court did not err.

During the direct examination of Mr. Bradshaw and Detective Donnell, the defendant objected to any testimony about the contents of the video recording on hearsay grounds. The trial court provided the following instruction after the still photographs taken by Detective Donnell were admitted into evidence:

> Jurors, this witness has said that that is the defendant. For our purposes today, you will have to make that determination also. He has identified who he believes to be the defendant from the photographs, but that's for your concern also. These are going to be exhibits that you're going to be able to examine also and that's a determination you have to make.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

As our supreme court has confirmed, "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions–whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule–are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

We need not tarry long over the defendant's claim because the video recording did not qualify as a statement under Tennessee Rule of Evidence 801. "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). The video recording was clearly not "an oral or written assertion," and nothing suggests that the defendant's conduct on the video was "intended by the person as an assertion." *See id.* Consequently, the trial court did not err by permitting Mr. Bradshaw and Detective Donnell to testify as to what they observed when they watched the video recording.

## III. Sufficiency

The defendant also challenges the sufficiency of the convicting evidence for his conviction of theft, arguing that the State failed to prove that a taking occurred because the defendant denied taking anything.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

-11-

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Property is defined as "anything of value, including, but not limited to, money, real estate, tangible or intangible personal property, including anything severed from land, library material, contract rights, choses-in-action, interests in or claims to wealth, credit, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power." *Id.* § 39-11-106. In most theft cases,

"Value":

(A) Subject to the additional criteria of subdivisions (a)(36)(B)-(D), "value" under this title means:

(i) The fair market value of the property or service at the time and place of the offense; or

(ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense;

. . . .

(C) If property or service has value that cannot be ascertained by the criteria set forth in subdivisions (a)(36)(A) and (B), the property or service is deemed to have a value of less than fifty dollars ($50.00);

*Id.* § 39-11-106(36)(A),(C).

In our view, the evidence adduced at trial was sufficient to support the defendant's conviction of theft of property valued at less than $500. Mr. Bradshaw

testified that someone smashed in the front door of the store and took "two .175, approximately half a gallon" containers of vodka from just inside "the entrance to the right of the front door." Mr. Bradshaw testified that the value of the bottles was less than $75 and that the value of the broken door was $285. Both Detective Donnell and Mr. Bradshaw identified the defendant from the surveillance video as the perpetrator. The jury, as was its prerogative, rejected the defendant's claim that he did not take anything from the store after smashing the window.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE